**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BRIAN BOC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 20 C 805** |
| **v.** | ) | |
| | ) | **Judge Rebecca R. Pallmeyer** |
| **ABLE ENGINEERING SERVICES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Brian Boc alleges that Defendant Able Engineering Services discriminated against him in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, by permitting a hostile work environment and constructively discharging him. Specifically, Boc claims that his coworkers meddled with his belongings and subjected him to other forms of harassment for approximately three years, and that these actions were undertaken because of certain medical conditions that Boc suffered from following his treatment, years earlier, for cancer. Defendant now moves for summary judgment. As described below, Boc found minor or innocuous incidents very troublesome. But the evidence does not support his claim that any of the incidents he complained of constituted harassment on the basis of his cancer treatment, that any of the alleged mistreatment was severe or pervasive, or that there is a basis for employer liability in this case. The motion [49] is granted.

## BACKGROUND

Plaintiff Brian Boc worked as a "Shift Engineer" at One South Wacker, a high rise building in Chicago, Illinois, from 2006 to 2018. (Boc Dep. 1, Ex. 1 to Def.'s Rule 56.1 Statement of Facts (hereinafter "Boc Dep. 1") [50-1] at 11:2-9, 14:12-15.)[1] As a Shift Engineer, Boc was responsible

---

[1]     The court generally refers to the Rule 56.1 Statement of Facts submitted by each party, but the court cites directly to the exhibits where the parties disagree about a fact or where the exhibits provide a more complete picture. Where both parties submit the exact same exhibit—

for operating and maintaining the building's mechanical, electrical, and heating systems. (Def.'s Rule 56.1 Statement of Facts (hereinafter "Def.'s SOF") ¶ 9.) In 2015, the building was sold to new ownership, and the new owner contracted with Defendant Able Engineering Services ("Able"). (Boc Dep. 1 at 13:22-14:19.) As Boc recalls, in May 2015, representatives from Able came to One South Wacker and gave him and the other engineers paperwork to fill out to become Able employees. (*Id.* at 13:3-14:4.) Boc then worked as an employee for Able at One South Wacker from May 2015 to October 25, 2018. (Def.'s SOF ¶ 4.)

Eight engineers were employed at One South Wacker during Boc's tenure with Able. (*Id.* ¶ 7.) Boc reported directly to Patrick Barry, the Chief Engineer, and Rory Durkin, the Assistant Chief Engineer. (*Id.* ¶ 8.) Boc also received direction from John Roziniak, the lead engineer. (Boc Dep. 1 at 16:5-9.) In addition to Boc, Barry, Durkin, and Roziniak, there were two other "permanent engineers": Tony Walsh and Dan Hendron. (*Id.* at 14:20-15:6.) Boc also worked alongside two "temporary engineers," Jim Olree and Tom Starin, though Boc believes Starin was no longer working at One South Wacker by the time Boc's employment ended. (*Id.* at 15:9-16.) All of the engineers performed the same general duties. (*Id.* at 16:1-4.)

Boc was diagnosed with cancer in May 2012 and was on leave, undergoing chemotherapy and radiation treatment, until October 24, 2012. (Def.'s SOF ¶ 64.) He returned to work in 2013. (Pl.'s Rule 56.1 Additional Statement of Facts (hereinafter "Pl.'s ASOF") [59] ¶ 7.) Boc testified that Durkin and Roziniak were employed at One South Wacker at this time and therefore knew that Boc had taken medical leave from work for cancer treatment. (Boc Dep. 1 at 32:1-5.) In 2015, when Barry began employment at One South Wacker as Able's Chief Engineer, Boc told Barry that he was a cancer survivor. (Durkin Dep., Ex. 4 to Pl.'s ASOF (hereinafter "Durkin Dep.") [59-4] at 39:24-40:18; Pl.'s ASOF ¶ 9.) Boc also testified that he told Walsh about the cancer, and that he possibly mentioned it to Jack O'Rourke, Able's regional vice president; Tom Flynn,

---

as occurred with the Boc deposition cited here—the court cites the first exhibit entered on the docket.

Able's "building engineer," who "looks into the accounts from the different buildings"; and Russell Hale, Able's human resource manager. (Boc Dep. 1 at 31:7-15, 113:11-20; Def.'s SOF ¶ 20.)

The radiation treatment damaged Boc's salivary glands by causing them to produce insufficient amounts of saliva. (Boc Dep. 1 at 141:4-10.) As a result, it was important for Boc to stay hydrated, including during the work day. (Def.'s SOF ¶ 65.) Boc believed that he had to bring his own water bottles to work because the building at One South Wacker "was constructed between 1978 and 1982, [which] was prior to the EPA Safe Water Act of 1986 which meant that the building materials used . . . to build the plumbing . . . [are] unsafe and ha[ve] the ability to leach lead into the water." (Boc Dep. 1 at 142:1-6.) Boc believes that the building's tap water was not just a danger to himself as a cancer survivor but that "it probably would be a danger to everyone at South Wacker." (*Id.* at 143:3-6.) No one told Boc that the building's water was unsafe to drink, however, and Boc did not report this concern to anyone. (*Id.* at 142:20-143:14.)

In addition to the water bottles, Boc brought bottles of Ensure, a nutrition drink, to work. (*Id.* at 33:8-9.) Boc also brought Benefiber—a dietary fiber supplement—to help address constipation, which was a lingering symptom from his chemotherapy treatment. (Def.'s SOF ¶ 66.) Up until 2016, Boc stored all of these items in his backpack, which he would keep "on top of the countertop in the engineering office along with everybody else who was keeping their personal belongings" there. (Boc Dep. 1 at 45:14-17.)

## I. Alleged Incidents

Boc has described a host of incidents in which he felt harassed by coworkers or supervisors—including several occasions when he suspected someone had tampered with his belongings—beginning on December 21, 2015, and continuing until October 6, 2018. (*See* Def.'s Mem. in Supp. of Summ. J. (hereinafter "Def.'s Mem. in Supp.") [51] at 8.) Prior to December 2015, Boc had not experienced any similar incidents with these coworkers or supervisors, either while employed under Able or a predecessor employer. (Def.'s SOF ¶ 14.) In fact, Boc generally

3

got along with his co-workers and does not recall having any arguments or disagreements with them.  (*Id.* ¶ 13.)

### 1.    Chief Barry touching his zipper

On December 21, 2015, Boc met with Barry to discuss "a keying problem for one of the tenants," and Barry "placed his hand on his zipper and in his crotch area."[2]  (Boc Dep. 1 at 83:11-17.)  Boc "found that to be very offensive, and [he] got up and [he] walked out of the office."  (*Id.* at 83:15-17.)  Later on, when Boc ran into Barry on a different floor, Boc told Barry why he had walked out of the office, and Barry suggested they go back to his office to discuss the matter.  (*Id.* at 83:18-22.)  Back in Barry's office, Barry "denied having done anything."  (*Id.* at 83:22-24.)

Boc's explanation of the incident is that Barry "made a very physical gesture with his zipper by placing his hand where his zipper was, almost looking like he was going to unzip his pants." (*Id.* at 85:10-12.)  This made him uncomfortable because "it's very sexual in nature," and he felt Barry was "trying to intimidate [him]."  (*Id.* at 85:19-20.)  Boc admits he has "no idea" what Barry was trying to communicate with the hand gesture but notes that "there was only one thing behind his zipper and that's a man's genitalia."  (*Id.* at 86:7-11.)  Boc interpreted Barry's conduct as a suggestion that Boc "[p]erform some sexual act."  (*Id.* at 86:16-19.)  Boc acknowledges, however, that Barry never said anything of a sexual nature before or after this incident.  (*Id.* at 86:20-87:1.)  Boc also admits that he cannot rule out the possibility that the proximity of Barry's hand to his zipper was merely a coincidence.  (*Id.* at 87:2-4.)  And of particular importance to Boc's present legal claim, Boc was asked during his deposition whether "this incident relate[s] to [his] . . . cancer at all," and Boc responded: "No."  (*Id.* at 87:5-7.)

The next day, December 22, O'Rourke came to the building to meet with Boc about the incident.  (*Id.* at 87:21-88:3.)  O'Rourke asked Boc if he would like to be transferred to a different

---

[2]    According to the transcript of Boc's deposition, Boc first stated that this incident occurred on "February 21st, 2015," but at other points of the deposition the parties clarify that this incident occurred on December 21, 2015.  (*See* Boc Dep. 1 at 83:7-8, 87:11-21.)

building, and Boc told O'Rourke that he was not interested.  (*Id.* at 88:17-23.)  O'Rourke testified that Boc said he and Barry had "worked it out" and that they had put the incident behind them. (O'Rourke Dep., Ex. 5 to Def.'s SOF (hereinafter "O'Rourke Dep.") [50-5] at 41:11-19.)

### 2. Extra water bottles in Boc's backpack

Boc testified that on January 28, 2016, he "was carrying 6 bottles of water" into work.  (Boc Dep. 1 at 45:9-11.)  Midway through the day, however, Boc "found that [he] had 8 bottles": he had an empty bottle, he "had 1 on [his] person, and there w[ere] 6 in [his] backpack."  (*Id.* at 45:11-14.)  Boc had been storing his backpack in the engineering office, and he "kind of thought that somebody had gone in and put too many water bottles [into his backpack]."  (*Id.* at 45:23-24.)  Boc did not know who did this but he suspected it was "[e]ither the engineers or somebody with Able Engineering." (*Id.* at 46:21-47:5.)

Boc suspects this incident—which occurred some three years after he returned to work following cancer treatment—relates to his cancer history because, after returning to work in 2013, he had told Barry and Durkin about his need to stay hydrated.  (*Id.* at 49:23-50-12.)  Earlier that day, Boc also overheard some (unnamed) engineers talking about drinking water, and about whether they were drinking enough.  (*Id.* at 45:19-22.)  This was the first and only time Boc found extra water bottles in his backpack.  (Def.'s SOF ¶ 23.)  Boc does not explain how the additional water bottles harmed him.

### 3. The serial number on Boc's water bottle matching a room number

On February 10, 2016, Boc received a work order to fix the temperature in office 254.  (*Id.* ¶ 24.)  Boc realized that the serial number on one of the water bottles he had brought to work ended with those digits:  254.  Earlier that day, Boc had heard Barry and Durkin talking about a ladder; because Boc's work assignment in office 254 required the use of a ladder, Boc concluded that Barry and Durkin had been planning this incident.  (Boc Dep. 1 at 94:12-95:2.)  Boc again does not say that the work assignment itself was troublesome, but he believes that Barry and Durkin were attempting to "intimidate[ ]" him by creating "a gas lighting [sic] situation where they

tried to make it seem like it's [Boc's] imagination." (*Id.* at 94:12-95:2.) As for how Barry and Durkin could have known the serial number on the bottle, Boc believes they must have "pick[ed] the lock on [his] locker . . . [and] got access to the backpack," and then "look[ed] at the water bottle." (*Id.* at 95:11-21.)

Boc draws a connection between this office 254 incident and the incident in which he discovered extra bottles of water in his backpack. He testified that he believes Barry and Durkin had added the bottles on January 28 to "see if [Boc] was keeping track of how many bottles [he] had in [his] possession." (*Id.* at 95:23-24.) And he believes the office 254 work order was a way for them to say, "we're still going in your backpack and this is to prove [it]." (*Id.* at 96:4-5.)

Boc did not report the episode involving the serial number, but he testified that this incident "made [him] make [a] security report about the water bottles" that were added to his backpack in January. (*Id.* at 96:96:14-16.) On February 16, 2016, Boc did make security report to One South Wacker's security vendor (unaffiliated with Able) about the extra bottles incident. (Def.'s SOF ¶ 25.) It appears that the incident was investigated: the security report states that an (unnamed) officer "talked with the engineers and each denied going into [Boc's] back pack [sic] and giving him 2 extra bottles of water." (Security Report, Ex. 7 to Def.'s SOF [50-7] at 2.) The report also states that "Pat Barry was notified of the incident." (*Id.*) Barry testified that after he learned about the security report, he too asked the engineers if anyone had touched Boc's water bottles, and everyone said they had not.[3] (Barry Dep., Ex. 3 to Def.'s SOF [50-3] at 105:19-107:21.) Boc testified that Barry approached him and warned that the building would cancel its contract with Able "if their employees couldn't be controlled." (Boc Dep. 1 at 130:1-5.)

The next day, February 17, O'Rourke came to the building to speak with Boc. (*Id.* at 89:16-21.) Boc told O'Rourke about the extra bottles incident and also talked about being "a

---

[3] Boc points out that one engineer, Rusiniak, testified that no one from Able asked him about the bottles. (*See* Rusiniak Dep., Ex. 3 to Pl.'s ASOF (hereinafter "Rusiniak Dep.") [59-3] at 35:19-36:5.)

cancer survivor and that [he] needed to stay hydrated with drinking water because of . . . the damage to [his] saliva gland from radiation treatment." (*Id.* at 90:7-14.) O'Rourke suggested Boc secure his belongings in a locker and consider sealing the zippers on his backpack. (Def.'s SOF ¶ 28; O'Rourke Dep. at 51:10-16.)

Boc never spoke with or reached out to O'Rourke after this meeting. (Def.'s SOF ¶ 29; Boc Dep. 1 at 130:12-14.) Boc believes the incidents that followed his security report and meeting with O'Rourke, discussed below, were attempts to "intimidate . . . and control [him] with retaliatory action." (Boc Dep. 1 at 130:17-21.) Boc testified that "there was no sense in going back to Jack O'Rourke because this had escalated to a point where they were just trying to control it themselves." (*Id.* at 130:23-131:1.) Boc does not say who "they" were.

### 4.    Tenant complaint about the fitness center

On March 15, 2016, two Able representatives—Brendan Winters, the building manager, and another unnamed person—met with Boc to discuss a complaint about Boc's maintenance work in the building's fitness center. (*Id.* at 98:17-21.) Specifically, one of the building's tenants had complained that the fitness center was closed for maintenance on a Sunday. (*Id.* at 99:11-16.) Boc testified that the manager of the fitness center had approved the scheduled work, and there had never before been a complaint about his maintenance work in the fitness center. (*Id.* at 100:2-24.) Boc found the complaint "kind of strange because all [the tenant] had to do is go to the office of the building and they could have discussed it with the chief engineer or assistant chief." (*Id.* at 101:2-5.) Boc was not disciplined in connection with the tenant's complaint. (Def.'s SOF ¶ 30.)

### 5.    Write-up for arriving late to work

Boc arrived late to work on March 15 (the same day he met with Winters about the fitness center incident). (*Id.* ¶ 31.) As a result, on March 21 or 22, Boc received a write-up. (Boc Dep. 1 at 101:12-15.) Boc believes this "was discriminatory in the sense [that he] was the only one that . . . was written up for [a] first time offense of being late." (*Id.* at 101:23-102:1.) Boc believes

it was done in "retaliat[ion] for [Boc] making the . . . security report in February." (*Id.* at 102:17-19.)  Boc did not complain to anyone at Able that he thought the write-up was retaliatory or discriminatory.  (*Id.* at 103:1-4.)

      **6.**      **Chief Barry asking Boc to relocate his stationary engineer's license**

Boc testified that after receiving a renewal of his stationary engineer's license in 2016, he brought the license to work, placed it in a frame, and hung it on the wall in the engineers' shared office at a height of about eight feet.  (Boc Dep. 2, Ex. 2 to Def.'s SOF (hereinafter "Boc Dep. 2") [50-2] at 24:3-25:24.)  At the time, the rest of the engineers' licenses were displayed either at their workstations or on a ledge that was midway up the wall.  (*Id.*)  After some time—Boc "do[esn't] know how long it was there" (*id.* at 25:22)—Boc decided to bring his license down to the ledge so that it would be at the same height as the other engineers' licenses.  (*Id.* at 25:17-26:3.)  But "within a few days or a week . . . all the engineers posted theirs at that eight-foot elevation" where Boc had previously hung his license, and Boc "just left [his] on the ledge where [he] had brought it down."  (*Id.* at 25:1-5.)  On September 14, 2017, Barry asked Boc to hang his license on the wall alongside the other licenses.  (Def.'s SOF ¶ 32.)  Boc wrote in his personal notes that day that the other engineers had "switched" locations of their licenses to "show [him] up."  (Boc Dep. 2 at 22:10-16.)

      **7.**      **Chief Barry talking about renewing his driver's license**

Boc's driver's license was set to expire on September 24, 2017, and for him to obtain a renewal, he needed to complete a vision test.  (Boc Dep. 2 at 9:9-24.)  In anticipation of the test, Boc went to two different eye doctors for an eye exam and a new set of glasses.  (*Id.*)  On September 17, Boc took the vision test, passed, and obtained his new license.  (*Id.*)  On September 21, Boc overheard a conversation between Barry, Durkin, and Hendron, in which Barry said he had received notice that he needed to renew his driver's license by December 2, 2017, and that he did not need to complete a new vision test to renew the license.  (*Id.* at 10:23-12:20.)  Boc "found it odd that [Barry] would be talking about getting a notification all the way in

September" for a deadline in December, and when Barry said he did not need a vision test, Boc "was pretty well convinced that they knew about [his] having to get the . . . driver's license and . . . ha[ving] to see an eye doctor." (*Id.* at 11:1-21.) Boc believes the September 14 stationary engineer's license incident, discussed above, was also connected to Boc's recent vision test and driver's license renewal, because both have "license in the name." (*Id.* at 30:18-22.)

Boc had never mentioned his driver's license renewal or vision test while at work. (Def.'s SOF ¶ 35.) Boc believes the other engineers found out about these events by stalking him, which they did to learn something about him "that they could bring up in casual conversation." (Boc Dep. 2 at 38:1-12.) Boc believes all of this was in "retaliation [for his] security report in 2016." (*Id.*) Boc did not report either of the license incidents. (Def.'s SOF ¶ 36.)

### 8. Water bottle missing a sticker and labeled with the wrong number

Following the water bottle incidents in January and February 2016, Boc decided to place stickers on the water bottles he brought to work, label the bottles "1" through "6," and bring home the empty bottles at the end of the day. (Boc Dep. 1 at 53:7-13.) After arriving home on December 17, 2017, Boc discovered that one of his empty bottles was missing a sticker and was labeled with the wrong number. (Def.'s SOF ¶ 38.) Boc believes Barry or Durkin had swapped the bottle out while Boc was working, because earlier that day, Boc had heard them talking over the radio about swapping containers of glycol that were used to cool the building's water pipes. (Boc Dep. 1 at 52:3-54:20.) Boc acknowledges that he did not see Barry or Durkin touch his backpack or water bottles. (*Id.* at 54:21-23.) Boc also notes that he secured his backpack that contained the bottles with two different locks, and he stored that backpack in a locked locker, and that to swap the bottles someone would have had to pick each of those locks. (*Id.* at 56:1-16.) Still, Boc is convinced of foul play, because he "tried to take a very scientific approach to make sure it wasn't [him] and it was somebody that was messing with [the bottles] and it wasn't [his] imagination." (*Id.* at 55:17-20.) Every day, after marking each bottle and placing a sticker on them, Boc "would line [them up] either laying down on the countertop or line them up in a row standing and [he]

9

would take a picture of them." (*Id.* at 55:9-13.)  Boc was so troubled by the suspected bottle swap that in his personal notes from that day, Boc wrote: "I cry at home saying this makes me sick to my stomach.  I pray at home." (*Id.* at 58:3-4.)

### 9. Missing Benefiber packet

On March 23, 2018, Boc went to his locker at lunchtime and discovered that the Benefiber packet he had placed in his backpack—which was itself locked and secured in a locked locker—was missing.  (Def.'s SOF ¶ 41.)  Boc did not see anyone touch his backpack or locker, but he believes someone must have picked the locks and taken it.  (*Id.*)  The antinausea medicine he took for chemotherapy left him with chronic constipation—the reason Boc relies on Benefiber; but Boc does not "recall discussing anything about [his] digestive system and Benefiber with anybody at work." (*Id.* at 65:7-18, 68:6-9.)  Boc did not report the missing Benefiber.  (Def.'s SOF ¶ 42.)

Again, Boc was deeply troubled by this incident.  To vent his anger, Boc called his answering machine at home and "ranted about what just happened."  (Boc Dep. at 66:21-67:9.) He did this "so that [he] wouldn't be angry at anybody at work" and so that no one would "be saying [he] was getting insubordinate with anybody." (*Id.* at 67:6-9.)  Boc testified that he did this when "there was an incident," because he "didn't want to lose [his] job, and [he] felt that if [he] got angry at anybody at work that [he] would be the one that would be written up." (*Id.* at 67:11-15.)

### 10. Removing tape from a railing

On April 25, 2018, Durkin asked Boc to remove tape from a railing in the main lobby. (Def.'s SOF ¶ 43.)  In order to reach the tape, Boc had to use a lift that would raise him to the height of the top railing.  (*Id.*)  When Boc reached the level of the top railing, he observed that the tape had removed some of the finish from the metal railing and brought this to the attention of Durkin and Barry, who were standing in the lobby below.  (Boc Dep. at 76:17-77:3.)  While Durkin and Barry were figuring out what to do next, Boc heard one of the building's security guards (not affiliated with Able) having a conversation with a person Boc did not know about accessing the building's garage.  (*Id.* at 77:7-15.)  At this point, Durkin then told Boc he could stop removing the

tape, because the building management would have to hire a metal finisher to complete the task and refinish the railing.  (*Id.* at 77:16-20.)

Again, Boc draws a series of inferences that lead him to believe these events were actually an incident of harassment.  On April 26, 1994, his niece committed suicide by hanging, and her body was found in a garage.  (*Id.* at 78:14-20; Def.'s SOF ¶ 44.)  Boc did not disclose the suicide to anyone at his worksite, but he believes that one Able employee at the corporate office and one (non-Able) building employee had become aware of it, and that one of them could have "informed people at One South Wacker of the details."  (Def.'s SOF ¶ 45; Boc Dep. at 81:8-10.)  Boc believes that Durkin and others were "intimidating" him by giving him a work task that Boc felt "relates to" the 24th anniversary of his niece's death.  Boc acknowledges that "[t]here's no correlation between [him] going on the lift and [his] cancer" history, but he characterizes the metal railing episode as "more intimidation."  (Boc Dep. at 81:20-82:5.)

### 11.    Finding an Ensure bottle without its cap

On August 10, 2018, Boc found an empty bottle of Ensure in his backpack.  Boc had drunk the contents of the bottle, and had rinsed it and placed it in his backpack, which was locked and in his locker, also locked.  But when he found the bottle, the cap was no longer screwed on it, and as a result, some of the residual liquid had spilled.  (Def.'s SOF ¶ 46.)  Boc did not see anyone touch his belongings, but he believes that someone picked the locks and untwisted the bottle cap. (*Id.* ¶ 47.)  Boc is confident that he did not mistakenly leave the cap off the bottle because he adheres to a "tedious procedure" after finishing each bottle, which includes always putting the cap back on.  (Boc Dep. at 70:8-17.)

On August 11, Boc complained to Barry that someone had unscrewed an Ensure bottle inside his backpack; Boc did not allege that this incident was discriminatory or that it related to his history of cancer.  (Def.'s SOF ¶ 48.)  Barry told Boc that he would inform Flynn, the building engineer, about the incident.  (Def.'s SOF ¶ 49.)  Flynn met with Boc on August 15, and then, along with Hale, met again with Boc on August 16.  (Def.'s SOF ¶¶ 49-50.)  Boc testified that he

told Flynn and Hale about "everything that had been going on since 2016." (Boc Dep. at 113:8-10.) When Hale asked Boc what he would like to happen, Boc said he wanted his water and nutritional items to be left alone. (Def.'s SOF ¶ 51.) Hale gave Boc his direct contact information and told Boc to inform him if he had any further issues or concerns. (*Id.* ¶ 52.)

### 12. Finding a dime on the office countertop

On October 5, 2018, Boc walked into the engineers' office and found a dime on the countertop near his laptop. (*Id.* ¶ 54.) At the time, Boc's computer password was "Roosevelt," and he knew that the person depicted on a dime is President Franklin D. Roosevelt. (*Id.*) Boc believes one of the engineers left the dime on the countertop "[t]o show that they had access to [his] computer." (Boc Dep. at 110:8-12.) Boc never told his password to anyone, and he has "[n]o idea" how someone could have gotten it. (*Id.* at 109:3-14.) Boc changed his password every 90 days in accordance with company policy. (*Id.* at 109:15-19.)

### 13. Hearing another phone's alarm go off

The next day, October 6, Boc was the only engineer at work because it was a Saturday, and he was the only one working overtime. (*Id.* at 103:9-105:9.) Boc sets alarms on his work phone to remind him of the day's tasks. (*Id.* at 103:9-16.) That day, prior to his shift, he turned on his phone and cleared his reminder. (*Id.* at 103:17-18.) Within "[o]ne to two minutes," another engineer's work phone that had been left stored in the office for the weekend "had a reminder, and it went off." (*Id.* at 103:17-104:11.) Again, Boc finds the circumstances intentional and suspicious. He believes that "[t]here's no reason for somebody else's phone to have a reminder on Saturday when [he's] the only one working there." (*Id.* at 105:6-8.) Boc feels that this "was just another way for them to say that they were tampering or messing with [his] property even though it was [a] company-issued phone and not [his] backpack." (*Id.* at 105:24-106:3.) Boc did not report the dime incident or phone alarm incident. (Def.'s SOF ¶ 56.)

## II.    Boc's Resignation from Able

In October 2018, Boc determined that the laundry services provider was not returning all of his work uniform clothing back to him, and he also occasionally found his uniform in the wrong place in the closet at work.  (Def.'s SOF ¶¶ 58-59.)  On October 25, 2018, after calling in sick for several days, Boc called Barry and complained about his missing uniforms; Barry testified that Boc then told him "he'[d] had enough" and was "going to quit."  (Id. ¶ 57; Barry Dep. at 40:24-41:5; Pl.'s ASOF ¶ 39.)  Barry testified that he tried to give Boc an opportunity to withdraw his resignation.  (Barry Dep. at 41:6-13.)  O'Rourke testified that he "was shocked" Boc had resigned, and that he "didn't want [Boc] to leave his employment."  (O'Rourke Dep. at 145:9-12, 146:21.)

Boc testified that his resignation "was a culmination of a daily anxiety that kept building." (Boc Dep. at 118:13-24.)  Boc explains the anxiety as follows:

> I had to prepare myself for work every day by taking pictures, by marking the water bottles, by disposing of them at my home, by removing water bottle labels and keeping them in plastic bags in my basement instead of throwing them out in fear that somebody from my employment would come and pick through my garbage and then take the same bottles that I threw away in my garbage can and then put them back at the building and say . . . nobody is going into your belongings, you're leaving your water bottles all over the place.

(Id.)

Boc filed a Charge of Discrimination with the Illinois Department of Human Rights on April 5, 2019, claiming discrimination based on a perceived disability of cancer.  (Def.'s SOF ¶ 72.) Boc received a Right to Sue Letter and filed suit in this court, claiming discrimination and failure to accommodate under the ADA.  (See Compl. [1].)  Following a hearing, Boc filed an amended complaint, in which he withdrew the failure-to-accommodate claim.  (See Am. Compl. [27].)  Boc's only remaining claim is that "[o]n October 25, 2018, [he] was constructively discharged by Defendant when his work conditions became so unreasonable that he had no other option but to resign to preserve his health and well-being."  (Id. ¶ 22.)  Able now moves for summary judgment on that claim.

## DISCUSSION

To obtain summary judgment, a party must demonstrate that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). There is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court construes all facts and reasonable inferences in the light most favorable to the non-moving party. *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). But the court draws only reasonable inferences, "not every conceivable one." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721 (7th Cir. 2018) (citation omitted). Indeed, the court's "favor toward the nonmoving party does not extend to drawing '[i]nferences that are supported by only speculation or conjecture.'" *Id.* (alteration in original) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008)). To defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A mere "scintilla of evidence" supporting the non-movant's position does not suffice. *Anderson*, 477 U.S. at 252.

## I.    Plaintiff's Claim

As a threshold matter, the court notes that Boc has not always been precise about the nature of his legal claim. He has clearly alleged constructive discharge. (Am. Compl. ¶ 22.) And, in response to Able's motion for summary judgment, he has contended that the constructive discharge was the product of his being subjected to a hostile work environment. (Pl.'s Mem. in Opp'n [58] at 19 ("Boc suffered an adverse action as a result of his co-workers' and his supervisors' treatment of his condition. Whether it be their exacerbation of his stress and worry regarding the maintenance of his health, or the fact that he was constructively discharged from his position at Defendant as a result of said actions, the fact still remains that Mr. Boc suffered an adverse action to which the law provides a remedy."); *see Ford v. Marion Cnty. Sheriff's Off.*, 942

14

F.3d 839, 851 ("[W]e hold that hostile work environment claims are cognizable under the ADA.").)

Boc's hostile work environment claim falls comfortably within his constructive discharge theory.

*See Wright v. Ill. Dep't of Child. and Fam. Servs.*, 798 F.3d 513, 527 (7th Cir. 2015) ("In the first

form [of constructive discharge], an employee resigns due to alleged discriminatory harassment.

Such cases require a plaintiff to show working conditions even more egregious than that required

for a hostile work environment claim.").

Boc has also hinted at other claims; for example, in responding to Defendant's argument

that it had responded reasonably to Boc's complaints (*see* Def.'s Mem. in Supp at 11-13), Boc

argued that "Defendant Did Not Accommodate Plaintiff's Impairment." (Pl.'s Mem. in Opp'n at 19-

20.) The background section of his memorandum also suggested that Able had retaliated against

him for filing the security report. (*See* Pl.'s Mem. in Opp'n at 6 ("Defendant was trying to intimidate

and control [Boc] with retaliatory action because of his security report."); *id.* at 7 ("[T]hey wanted

to track [Boc] just to keep [him] under surveillance . . . because [he] made a security report in

2016.").)

A plaintiff may not ordinarily amend his complaint through arguments in a summary

judgment brief. *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012). In this case, the court

does not interpret Boc's passing references to accommodation or retaliation as an effort to assert

new legal claims under those sections of the ADA. In any event, Boc has not argued that he

requested an accommodation from his employer or that the security report related to a disability.

The court therefore turns to the hostile work environment claim and the claim of constructive

discharge.

## II.    Hostile Work Environment

To survive summary judgment on a claim of hostile work environment, Boc must present

evidence sufficient for a reasonable jury to find "(1) unwelcome harassment; (2) based on a

protected characteristic; (3) that was so severe or pervasive as to alter the conditions of

employment and create a hostile or abusive working environment; and (4) a basis for employer

liability." *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 977 (7th Cir. 2021) (en banc). These elements are the same under the ADA as under Title VII. *Id.* In evaluating hostile work environment claims, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

The court need not resolve the threshold issue of whether Boc is disabled under the ADA.[4] Even if Boc's post-cancer need for frequent hydration and nutrition is a "protected characteristic," he must provide evidence that the 13 alleged incidents were *based on* that characteristic. *See Demkovich*, 3 F.4th at 977. Boc himself admitted that the first incident, where Barry allegedly touched his zipper, was not related to Boc's cancer. Boc similarly fails to make any connection between the meeting about the fitness center (incident 4), the write-up for being late (incident 5), the engineer's or driver's license discussions (incidents 6 and 7), removing tape from a railing (incident 10), finding a dime (incident 12), and hearing another phone alarm go off (incident 13), and his symptoms. To the contrary, Boc connects some of these incidents to what he perceives as retaliation for making a security report in 2016.

As for the remaining incidents—those relating to his water bottles, his packet of Benefiber, and his bottle of Ensure (incidents 2, 3, 8, 9, and 11)—Boc provides no credible evidence that

---

[4] Under the ADA, Boc is disabled if he has (1) "a physical or mental impairment that substantially limits one or more major life activities," (2) "a record of such an impairment," or is (3) "regarded as having such an impairment." *Richardson v. Chi. Transit Auth.*, 926 F.3d 881, 886 (7th Cir. 2019). Cancer is an impairment. 29 C.F.R. § 1630.2(j)(3)(iii); *Richardson*, 926 F.3d at 887 ("EEOC regulations interpreting the ADA are entitled to deference [unless arbitrary and capricious]."). Cancer is still an impairment when it is in remission. *See* 42 U.S.C. § 12102(4)(D) ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."). But lasting symptoms stemming only from the cancer *treatment* may not themselves constitute a disability, particularly when they do not limit a major life activity or lead the employer to regard the employee as disabled. The court need not address this matter further, however, because Boc has not shown the required causal connection between his frequent need for water and other nutrition (whether constituting a disability or not) and the alleged incidents.

Able employees played any role in those incidents, much less that they acted with the intent to harass Boc based on his need for hydration and nutrition.  Beyond Boc's unsupported speculation, there is no evidence from which the court can draw a reasonable inference of foul play.  In fact, given the security measures Boc undertook after the first incidents in early 2016, including placing his water and other items behind three separate locks, the only reasonable inference the court can draw from this record is that the incidents were likely the result of coincidence, or else Boc's own occasional accident or mistake.[5]

Even if the court were to agree that Boc had been the victim of hostility or pranks, his claim fails for other reasons.  First, it is not clear that several of the engineers at One South Wacker even knew that Boc consumed water, Benefiber, or Ensure for the purpose of alleviating certain symptoms that resulted from his cancer treatment.  While some engineers knew that Boc had been treated for cancer several years earlier, there is no evidence that the engineers knew the radiation and chemotherapy treatments left Boc with constipation and damaged saliva glands. The mere fact that Boc brought water and nutritional items to work does not indicate that his coworkers knew about his condition; many people, for many reasons, consume nutritional supplements, and every person consumes water.  Boc did testify that, after returning to work in 2013, he told Barry and Durkin that "the doctors told [him] that [he] had to stay hydrated, just to carry a bottle of water with [him]."  (Boc Dep. at 50:1-8.)  But that disclosure, upon his return to work, is not evidence that coworkers understood that he had a chronic condition requiring significant hydration years later.  In any event, at most Barry and Durkin—not any other engineers—were aware of Boc's condition.  Boc also testified that he told O'Rourke when they met on February 17, 2016—after the extra bottle and serial number incidents—about the connection between his need to drink water and his cancer.  But Boc does not allege that O'Rourke—Able's regional vice president, who was not generally present at One South Wacker—

---

[5]     Boc's insistence that he takes a careful, scientific approach in his daily life does not lead to an inference that his coworkers are responsible for the alleged incidents.

was the culprit behind the incidents, and there is no evidence that O'Rourke disclosed Boc's condition to his co-workers. Boc may also have told Flynn and Hale about the connection when he met with them on August 16, 2018, since he testified that he told them about his need for "a secure water supply" (Boc Dep. at 114:14-15), but by that time all of the alleged incidents relating to Boc's water and nutrition had already occurred. In sum, Boc has not provided evidence that the alleged incidents were based on a protected characteristic.

And, even if Boc had made that showing, the court is unable to conclude that the incidents so troubling to him were in fact sufficiently "severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment." *Demkovich*, 3 F.4th at 977. Boc does not cite or discuss any caselaw in his motion that relates to his claim of hostile work environment (or, for that matter, to his claim of constructive discharge). The court is not aware of any case where incidents similar to those Boc alleges—even if presumed to be true, the fault of the other engineers, and undertaken to harass Boc because of his health conditions—surpass the "severe or pervasive" bar. As just one example, in *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 601 (7th Cir. 2014), the Seventh Circuit found that six incidents of harassment, including a co-worker slamming a food tray into the plaintiff's chest and, at another point, calling the plaintiff a racial epithet, did not amount to severe or pervasive conduct.

In comparing Boc's alleged incidents to *Nichols*, and considering the factors noted in *Harris*, the court concludes, as a matter of law, that the alleged harassment here was not severe or pervasive. First, five water-related or nutrition-related incidents over a span of about three years do not amount to frequent harassment; for one thing, it is far less frequent than the six incidents over two-and-one-half weeks that the *Nichols* court found to weigh in the plaintiff's favor. *See Nichols*, 755 F.3d at 601. So the alleged harassment was not pervasive or frequent. Nor was it severe. The extra bottles Boc allegedly found in his backpack appear to be harmless at worst. The remaining water-related and nutrition-related incidents involve allegations that someone picked the locks of Boc's locker and backpack and meddled with his belongings. Boc,

like all employees, is entitled to a reasonable level of privacy and autonomy, and the court does not condone such actions. But beyond the alleged violation of Boc's expectation that others will not enter his locker and touch his property, Boc does not allege any meaningful harm. At worst, Boc went a single day without a packet of Benefiber, and on one occasion had to clean a small mess from an unscrewed (but rinsed) Ensure bottle. This pales in comparison to the physical altercation and racial epithet that the plaintiff suffered in *Nichols*—incidents that the court found were *not* sufficiently severe. And here, as in *Nichols*, Boc has not shown that he was physically threatened or that the harassment interfered with his work performance. *See id.*

Finally, Boc offers no evidence that would support a claim of employer liability. Even if Boc had shown that the other engineers created a hostile work environment, it is well-recognized that an "employer can avoid liability for coworker harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009) (internal quotation marks omitted). Able maintained a Discrimination and Harassment Policy and Complaint Procedure. (Def.'s SOF ¶ 73; *see Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 630 (7th Cir. 2019) ("An employer's adoption of an effective anti-harassment policy is an important factor in determining whether it exercised reasonable care to prevent . . . harassment.").) Every time Boc complained about an incident, Able representatives met with Boc to try to find a resolution. When Boc filed a security report, the building's security checked with each engineer and found nothing; Barry testified that he then followed up with each engineer himself. On at least one occasion, Boc was offered the opportunity to transfer to another location. Still, Boc claims Able could have done more; he believes that Able could have undertaken a "widespread" investigation and "installed surveillance equipment outside the . . . locker room." (Pl.'s Mem. in Opp'n at 14, 19.) But Able was only under the obligation to "take action *reasonably calculated* to stop unlawful harassment." *Muhammad v. Caterpillar, Inc.*, 767 F.3d 694, 698 (7th Cir. 2014) (emphasis added). Given that Boc does not appear to have

provided Able with any actual evidence of wrongdoing, a reasonable trier of fact cannot conclude that Able failed to take appropriate corrective action.

In the end, Boc's claim appears to rest only on his speculation that his coworkers (1) knew about his condition, (2) were responsible for the alleged incidents, and (3) intended that the incidents would harass Boc based on his condition. Boc's "subjective beliefs . . . are insufficient to create a genuine issue of material fact." *McMillian v. Svetanoff*, 878 F.2d 186, 190 (7th Cir. 1989). And even had Boc submitted evidence to support his speculations, he cannot claim that the incidents rise to the level of a hostile work environment, or that Able is liable for the alleged acts of his coworkers.

## III. Constructive Discharge

Constructive discharge "occurs when the plaintiff shows that he was forced to resign because his working conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). Where an employee resigns due to discriminatory harassment, the plaintiff must "show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress . . . thereby allowing an employer to address a situation before it causes the employee to quit." *Id.* (citation omitted). For example, a plaintiff may be constructively discharged if they resign out of a reasonable fear for their personal safety. *See, e.g.*, *Taylor v. W. and S. Life Ins. Co.*, 966 F.2d 1188, 1191, 1199 (7th Cir. 1992) (affirming a finding of constructive discharge where the plaintiff's supervisor held a firearm to the plaintiff's head). Because, as discussed above, Boc has not provided evidence that he suffered from a hostile work environment, he cannot show the working conditions were "even more egregious" such that they were "unbearable." *Chapin*, 621 F.3d at 679.

Another form of constructive discharge "occurs [w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *Wright*, 798 F.3d at 527 (alteration in original) (internal quotation marks omitted). Boc has suggested that

his supervisors wanted to get rid of him. (*See* Am. Compl. ¶ 21 ("Defendant refused to assist Plaintiff because they wanted Plaintiff, a cancer survivor, [to] leave his employment with Defendant.").) But he has presented no evidence that any Able personnel intended to terminate him. To the contrary, the steps Able took to meet with Boc to seek a resolution, as well as the testimony from Barry and O'Rourke that they were surprised or dismayed by Boc's resignation, completely undermine any claim that this form of constructive discharge occurred here.

<u>**CONCLUSION**</u>

Defendant's motion for summary judgment [49] is granted.

ENTER:

Dated: March 25, 2022

REBECCA R. PALLMEYER
United States District Judge